**William E. BROCK, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**The CLARIDGE HOTEL AND CASINO, Defendant.**

**Civ. A. No. 84–4336.**

United States District Court, D. New Jersey.

Jan. 10, 1989.

**780**

U.S. Dept. of Labor by Patricia M. Rodenhausen, Regional Sol., and Percy S. Miller, New York City, for plaintiff.

Fisher & Phillips by William F. Kaspers, Atlanta, Ga., and Spengler, Carlson, Gubar, Brodsky & Frischling by Adin C. Goldberg and Donald B. Davis, New York City, and The Claridge Hotel and Casino by Gloria E. Soto, Atlantic City, N.J., for defendant.

## OPINION

COHEN, Senior District Judge:

This case, originally instituted before us by the Secretary of Labor, comes back to us on remand from the Third Circuit, 846 F.2d 180 (1988), after a denial of certiorari by the Supreme Court, *sub. nom. Claridge Hotel and Casino v. McLaughlin,* —— U.S. ——, 109 S.Ct. 307, 102 L.Ed.2d 326 (1988),

for a clarification of one aspect of our previous opinion. *See* 664 F.Supp. 899 (D.N.J.1986). The Third Circuit has remanded the issue of whether the defendant, The Claridge Hotel and Casino ("The Claridge"), could have reasonably believed that its minimum guarantee pay plan[1] ("plan") complied with the provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 213(a)(1), 216(b) and the regulations promulgated thereunder, 29 C.F.R. § 541 *et. seq.*; and whether the defendant acted intentionally, or with reckless disregard of the terms of the agreement, in violation of the plan and in contravention of the FLSA.

### I. *Factual Background*

Gambling on a big infusion into a dying coastline, the New Jersey State Legislature cleared the way for gambling casinos to be constructed at the seashore by passing the 1976 amendment to the New Jersey Constitution, Article 4, § 7, ¶ 2, which added subparagraph (D) establishing the lawfulness of gambling in Atlantic County. N.J.S.A. Const. Art. 4, § 7, par. 2 (West 1988). Soon thereafter, a number of casinos opened in Atlantic City, including The Claridge which opened in approximately June of 1981. The Claridge operates a gaming casino which is licensed by the New Jersey Casino Commission, and provides a full fare of games of chance such as baccarat, blackjack, craps, roulette and various denominations of slot machines. The Claridge employs three types of allegedly "supervisory" employees for work at the gaming tables, called boxpersons, floorpersons and pit bosses. *See,* 664 F.Supp. at 901; 846 F.2d at 181–82.

The issue on remand involves the minimum guarantee pay plan established by The Claridge for these employees so that they could properly be treated as supervisors as contemplated by the FLSA, 29 U.S. C. § 213(a)(1); 29 C.F.R. § 541.1, and be

---

**1.** From the time the Claridge opened, it had in effect a plan which allegedly guaranteed box persons, pit bosses and floor persons at least $250 per week with certain restrictions in certain instances, around which most of the controversy was surrounded at trial. We have pre-

viously defined and discussed at length the duties of the positions of boxpersons, pit bosses and floor persons, 664 F.Supp. at 901, as has the Third Circuit, 846 F.2d at 181–82. The plan continues to be at issue on remand and is more fully discussed *infra.*

exempted from the time and one-half for overtime provisions of that statute. The plan was set up in an attempt to comply specifically with 29 C.F.R. § 541.119(a), a special "upset" proviso for high salaried executives, which states that:

(a) Except as otherwise noted in paragraph (b) of this section, § 541.1 contains an upset or high salary proviso for managerial employees who are compensated on a salary basis at a rate of not less than $250 per week exclusive of board, lodging, or other facilities. Such a highly paid employee is deemed to meet all the requirements in paragraphs (a) through (f) of § 541.1 if the employee's primary duty consists of the management of the enterprise in which employed or of a customarily recognized department or subdivision thereof and includes the customary and regular direction of the work of two or more other employees therein. If an employee qualifies for exemption under this proviso, it is not necessary to test that employee's qualifications in detail under paragraphs (a) through (f) of § 541.1 of this part.

Every boxperson, floorperson and pit boss was given a one page contract known as a "Weekly Salary Guarantee" [2] to sign, and once executed the agreement was placed in the employee's file. The salary structure The Claridge represented to these employees was a flat base per eight hour day and then an hourly rate for any time over eight hours, calculated by dividing the base by eight hours. However, as we found before, defendant's attempt to characterize the payment plan as a salary was essentially illusory [3] and these "supervisory" employees were paid strictly on an hourly basis. 664 F.Supp. at 904. The Third Circuit agreed, 846 F.2d at 184–187. The only question before us on remand then is whether The Claridge could reasonably have believed that this plan was in compliance with the FLSA, such that liquidated damages were properly denied. We set forth with greater clarity below additional factual findings which support our conclusion that The Claridge could in good faith have felt it had reasonable grounds to believe the plan it established was not in violation of the FLSA, 29 U.S.C. § 260 so as not to be liable for liquidated damages which are otherwise required by 29 U.S.C. § 216(b).

## II. Supplemental Articulation of Findings

In our prior opinion we found § 6(a) of the Portal-to-Portal Act, 29 U.S.C. § 255(a), to require a two-year statute of limitations rather than three years on plaintiff's claim for backwages because defendant's violation was not willful. We also decided that liquidated damages would not be assessed pursuant to 29 U.S.C. § 260 because we believed that The Claridge acted in "good faith and ... had reasonable grounds for believing that [its] act or omission was not a violation of the Fair Labor Standards Act of 1938." 664 F.Supp. at 905. As we understand the Third Circuit, the case has been remanded for clarification of the factual basis upon which we relied to reach both of the above conclusions. Thus there is no need for any further record to be made by the parties; rather we rely on the trial record, briefs pre and post trial, affidavits submitted to this Court and our own trial notes.

**2.** The Weekly Salary Guarantee states in toto:
In consideration of the fact that you are employed in a supervisory capacity, you will be guaranteed a weekly salary of $250.00 for any week in which you perform any service. Absence from work due to jury duty, court appearance or military leave will not affect this guarantee.
If your absence is due to an accident or illness, you will be covered under our sick leave and disability plans, and therefore this guarantee does not apply.

During weeks in which no service is performed, or in any given week when some service is performed but absence is voluntary or due to a personal reason, this guarantee does not apply.

**3.** "Just as dressing a mannequin up in a skirt and blouse does not transform it into a woman, so too masquerading an hourly employee's compensation as a guaranteed salary plus hour based bonuses does not transform the compensation scheme into a salary based plan." 664 F.Supp. at 904.

## A. Lack of Willfulness

In *McLaughlin v. Richland Shoe Company*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), the Supreme Court delineated the scope of the term "willful" for violations of the FLSA as the standard articulated in *Transworld Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) which is:

> a violation of the Act was "willful" if "the employer ... knew of showed reckless disregard for the matter or whether its conduct was prohibited by the [FLSA]."

469 U.S. at 126, 105 S.Ct. at 624. We applied this same standard, following *Brock v. Richland Shoe Co.*, 799 F.2d 80 (3d Cir.1986), *aff'd sub. nom. McLaughlin v. Richland Shoe Co., supra*, in our previous opinion prior to the Supreme Court's affirmance. We are satisfied that we applied the correct standard, and we therefore only further articulate the factual findings to which we applied this legal standard.

Pursuant to 29 U.S.C. § 255(a), if the employer's violation of the FLSA was willful, as determined by the above standard, then the employer is liable for three rather than the standard two years of backwages. We previously found that the Claridge had not willfully violated the relevant provisions of the FLSA. 664 F.Supp. at 905.

We found compelling The Claridge's argument that its attempt to devise a pay plan scheme that would comply with the requirements of the FLSA was an indication of a lack of willfulness. The mere fact, however, that The Claridge put into effect the minimum wage guarantee plan is not alone evidence of a lack of intent to wholly disregard the statute. Coupled with certain other factors, however, we found the overall gestalt to suggest a lack of willfulness.

Two other indicators we found persuasive of a lack of willfulness, were the fact that The Claridge cooperated fully with the Labor Department investigation, *See* Tr. 8–7–86; 9:3–25; 10: 1–25 (testimony of Constance McAdam, Payroll Supervisor for The Claridge from 1980–1984), and that The Claridge attempted to remedy its underpayments once it was brought to their attention by mailing adjustment checks to everyone The Claridge felt had triggered the $250 minimum payment guarantee but who had not received it. Tr. 8–7–86; 15:14–25; 16:1–25; 18:1–16 (testimony of McAdam).[4] These remedial measures led us to believe that The Claridge officials believed the pay plan to be operating, but that they were possibly negligent in enforcing the guarantee due to the combination of the computer system requirements and the fact that practically every employee earned well over $250 each week.

The lack of a safeguard to alert the payroll department that an individual was eligible for the guarantee, but had not received the minimum payment, does not, in our minds, rise to the level of reckless disregard of the terms of the agreement. It is possible that there did exist a duty on some other department to enforce the guarantee that we are unaware of, yet who did not properly fulfill this function. We will not speculate, however, as to who could have been responsible, nor as to whether The Claridge knew that the responsible parties were failing to enforce the agreement, because the government made no attempt to prove such facts at trial.

Thus, Constance McAdam's assertion during cross-examination (TR: 8–7–86:32:16–25; 33:1–25) that she personally never took steps to ensure that the guarantee was paid does not automatically lead us

---

**4.** On the basis of testimony concerning The Claridge's computer system and its method of computation, we found it difficult to believe that the Claridge was intentionally violating the FLSA, because of the confusing nature by which salaries were computed and the minuscule chance that someone would fall below the $250 cut-off. There was testimony to the effect that boxpersons, floorpersons and pit bosses were given indications of weekly and yearly salary amounts, but that they were paid by an hourly rate because the computer system used would only accept an hourly rate multiplied by hours worked. TR: 8–5–86: 122:14; 126:14–15 (testimony of Peter Tiano, Executive Director of Human Resources for The Claridge from 1984-the time of trial).

to the conclusion of a willful violation.[5] The government merely showed that this one individual did not take the necessary steps to ensure that the guarantee was given effect. What was essential for the government to have shown, and what it failed to prove, was that the individual responsible for enforcing the guarantee knowingly or recklessly failed to do so. The government did not establish Ms. McAdam as the person with that responsibility, nor did it suggest anyone else was responsible for enforcing the guarantee.

We therefore felt comfortable in applying the two year statute of limitations based on the interplay of all of these factors; the attempt to comply with the high salary upset proviso, the complexity of the computer system (and the sheer number of transactions that needed to be monitored), the fact that many individuals often showed up in more than one "supervisory" category, the very low percentage of violations that occurred in comparison to the large number of pay transactions, and the closeness of the question originally put before us.

### B. *Good Faith and Reasonable Grounds*

We believed that up until the point of the Labor Department investigation, The Claridge reasonably believed that its minimum pay plan was in compliance with the requirements of the FLSA, partly because as soon as it was suggested that they were in violation by failing, in some instances, to pay the minimum guarantee to covered individuals, The Claridge took measures to remedy the perceived violation. The fact that we found their whole payment scheme violative as an hourly rather than a salary basis, without more, does not impugn The Claridge's good faith that they were in compliance before our ruling, not only because of the complexity of the statute, but also because of the closeness of their plan to actual compliance.[6]

We also found compelling the fact that each employee signed the guarantee agreement and thus was put on notice of its application and assumedly was aware of its provisions. We assumed that any alleged violation by The Claridge would have resulted in the filing of a grievance, or at least a complaint, to either the employee's union or The Claridge, neither of which was ever shown at trial. The fact that such a complaint was never filed could have led The Claridge to believe that it had never failed to pay anyone under the agreement, thus giving them a reasonable basis upon which to rely that they were in compliance with the agreement.

Furthermore, we found that of the extremely large number of pay transactions, due to the high hourly wages of these employees, the $250 minimum was nearly always exceeded, and thus only a very small number of underpayments occurred. We believed this was possibly an indicator of oversight, but clearly not indicative of a deliberate strategy to violate the statute. The government did not show that The Claridge, through the payroll office or otherwise, was aware that the guarantee was not being enforced.

---

**5.** Ms. McAdam's further testimony, however, that no employee ever complained to her about not having been paid the $250 guarantee, although employees did complain to her about other salary problems, was persuasive to us of a lack of willfulness, because it was an indication that The Claridge had never denied an employee the $250 guarantee who asked for it. See TR: 8–7–86:33:7–25. Thus, The Claridge could have reasonably believed that payroll was paying the $250 guarantee to those who qualified, and payroll could have assumed that if they failed to recognize that the guarantee was due an employee, that the employee would have complained; since no employee complained to payroll, at least Ms. McAdam could have reasonably believed the casino was not in violation of the agreement.

**6.** We find the Third Circuit's language concerning the issue of The Claridge's willfulness or lack thereof to be equally compelling to answer the government's theory that The Claridge's failure to alter its plan after the Secretary found it to be violative indicates a lack of good faith:

> Yet, private parties must retain a right to disagree with the Secretary's interpretation of the regulations ...

846 F.2d at 188, n. 9. Thus, the fact that The Claridge did not change its pay practices until after we found them violative was meaningless to us on the question of whether The Claridge was asserting its position in good faith and with a reasonable belief of compliance prior to our ruling.

On the other hand, The Claridge did show that it had "an honest intention to ascertain and follow the dictates of the Act," *Marshall v. Brunner,* 668 F.2d 748, 753 (3d Cir.1982) first by its plan that was an attempt to comply with the Act, and then by its remedial measures once it was determined that its plan had not been actually effectuated in a small number of cases.

Finally, we do not suggest that The Claridge was merely ignorant of whether they were in compliance. We found that they had a reasonable ground to believe they were in compliance on the basis of the generally high salary paid and the lack of any complaints of failure to comply. We thus believed at trial, and continue to so believe, that these factors indicated that The Claridge acted in good faith and with reasonable grounds for believing its actions or omissions were not violative of the FLSA.

### III. *Conclusion*

We found from the record, exhibits and demeanor of the witnesses' testimony at trial that The Claridge may have been negligent in ensuring that it complied with the requirements of the FLSA by enforcing the minimum payment plan, but that it had a reasonable ground to believe it was not in violation of the FLSA.

Today we reiterate our previous determination, with greater clarity as directed by the Third Circuit, that The Claridge did not willfully violate the relevant provisions of the FLSA and that The Claridge acted in good faith and with reasonable grounds to conclude that it was not in violation of the FLSA. We therefore believe that we properly applied the two year statute of limitations and denied liquidated damages pursuant to the requirements of the Portal-to-Portal Act and therefore will not alter our previous Order. Our prior Order stands as to the amount that The Claridge is liable for back wages to the Department of Labor.